**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **BOBBI R. KENDALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 11-CV-406-PJC |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Claimant, Bobbi R. Kendall ("Kendall"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Kendall appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Kendall was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

At the June 21, 2010 hearing before the ALJ, Kendall said that she had several different jobs in the 1990s through 2001. (R. 51). She then quit working, moved in with her elderly father, and took care of him until he died. *Id.* During this time, she injured her neck and had fusion surgery in 2003. (R. 51-52). She went back to work in 2006 and worked as a cook and as

a food service worker. (R. 52-54). Her employer in 2009 transferred her to laundry work, because it was supposed to be lighter duty work. (R. 54-55). She was then fired because she could not do a "full-duty" job, and her last day was May 29, 2009. (R. 54-57). She had applied for several positions, but they required lifting more weight than the 10 to 15 pounds that her doctor said she could lift. (R. 57).

When asked to list what prevented her from working, Kendall listed her back, left shoulder, and bladder. (R. 59). Her back problem was her lower back, and Kendall described it as very painful, with sharp pains, dull pains, and shooting pains down the back of her legs. *Id.* The pain in her left leg was worse, and her leg pain happened at certain times, such as walking or sitting for too long. (R. 59-60). She estimated that she could walk for about 30 minutes, stand for 15 to 20 minutes, and sit for about 20 minutes before needing to change positions due to her back problem. (R. 60-61). Pain in the left side of her neck and her left shoulder combined to cause problems in sitting for longer than 20 minutes. (R. 61-62).

Kendall said that her left shoulder hurt all the time, with pain that she described as burning and shooting. (R. 62). She said that she could reach directly in front somewhat, but she could not reach up, to the left, or behind her with her left hand. (R. 62-63). While she had a 10-15 pound lifting limit, she could not lift that much with her left hand or arm. (R. 63). The pain also affected her ability to turn her head to the left or to look up. (R. 63-64). She said that her arms and hands went numb when she used the mouse on her computer for several minutes. (R. 64).

Kendall said that on a typical day she got up about 5:30 a.m. and took care of her pets and her own needs. (R. 65). She did her dishes, using a dishwasher, daily. *Id.* If she had a doctor's appointment, she would get ready for that. *Id.* If she needed groceries, she planned ahead to

make the trip to the store as short as possible. *Id.* After any trips outside her house, she would return and rest in her recliner. *Id.* She didn't do household chores as she had previously. (R. 66). She didn't sweep the floor all at one time, but would do it in "spurts." *Id.* She had difficulty cleaning the refrigerator because the bottom shelves were so low to the ground. *Id.*

Kendall said that the most comfortable position for her was lying down in her bed. *Id.* She estimated that, on a typical day, she would spend about half of her time lying down. (R. 67). She had trouble sleeping at night, because she would toss and turn and have trouble getting comfortable. *Id.*

Even though she had bladder surgery in October 2008, she had a prolapsed bladder that was external to her body and that would not stay when she returned it to an internal position. *Id.* She had learned to use lubricated pads, but she experienced pain and discomfort. (R. 67-68). She experienced incomplete evacuation of her bladder when she urinated, so she had frequent trips to the bathroom. (R. 69). She used a heating pad on her abdomen to get relief from discomfort. (R. 68). Kendall also described a problem in her rib cage area, and she said she had received cortisone shots, but they had not been entirely successful. *Id.*

She experienced depression after being fired from her job. (R. 70). She had lost interest and lost her confidence. *Id.*

Kendall saw Matthew Johnston, M.D. on February 21, 2008 as a new patient to establish care, and he noted her pain, history of fusion, and osteoarthritis. (R. 346-47). X-rays of Kendall's cervical spine done that day showed a previous fusion of C5 through C7, with a 2 mm retrolisthesis of C4 on C5 with narrowing of the C4/C5 disk space. (R. 342). X-rays of her lumbar spine showed moderate narrowing of the L4/L5 and L5/S1 disk spaces. (R. 341).

Kendall saw Dr. Johnston on March 5, 2008 for symptoms of diarrhea and rectal bleeding. (R. 348-49). Dr. Johnston's assessments were abdominal pain, gastrointestinal bleeding, and irritable bowel syndrome. (R. 349). He referred her to a specialist. *Id.* Kendall was seen at Claremore Regional Hospital on March 6, 2008 for loose, bloody, and tarry stools. (R. 343-44). At a follow-up appointment on March 18, 2008, Dr. Johnston assessed lower back pain with radiculopathy, insomnia, gastrointestinal bleeding, and peptic ulcer disease. (R. 350-51).

An MRI of Kendall's lumbar spine on April 7, 2008 showed degenerative disk space narrowing at L4/L5 and L5/S1 with dessication at all levels. (R. 345). There was broad based disk bulging at L5/S1, and the reviewing physician could not tell if it was compromising the exiting left L5 root. *Id.* At a follow-up appointment with Dr. Johnston on April 10, 2008, he made a referral to neurosurgery. (R. 354-55).

On April 28, 2008, Kendall saw Karl N. Detwiler, M.D., with Neurosurgery Specialists. (R. 364-65). Dr. Detwiler's examination of Kendall's extremities reflected that they were normal, and her gait was normal. *Id.* His impressions were multilevel disk degeneration, worse at L4/L5 and L5/S1 and complaints of radiculopathy on the left without neurologic deficit. (R. 365). He placed Kendall on medication and ordered an EMG study of her legs. *Id.*

At an appointment with Dr. Johnston on May 21, 2008, Kendall complained of stool incontinence and anxiety. (R. 356-57).

Also on May 21, 2008, an electrodiagnostic study of Kendall's legs was done. (R. 366-67). The impression of the physician was left L5 radiculopathy. (R. 367).

Andrew F. Revelis, M.D. conducted an evaluation of Kendall's axial back pain and left lower extremity pain on June 9, 2008. (R. 320-22). Kendall reported sleeping three hours per

4

night and experiencing depression. (R. 321). On examination of her cervical and lumbar spine, Kendall had full range of motion. *Id.* Dr. Revelis' impression was lumbar sciatica and left lower extremity radiculopathy. *Id.* Dr. Revelis performed left L4 and left L5 transforaminal epidural steroid injections and planned a series of injections. (R. 322-23).

On July 7, 2008, a physician's assistant for Dr. Detwiler saw Kendall to discuss results of a CT myelogram of her lumbar spine. (R. 361). The results showed broad-based disk bulges at L4/L5 and L5/S1, but they also showed "no nerve root impingement whatsoever." *Id.* Kendall was somewhat better after medication and Dr. Revelis' injection, but she was only able to tolerate work for four hours. *Id.* No surgery was planned, but physical therapy would be started. *Id.*

Kendall saw Dr. Michelle Brotherton with Northeast Oklahoma Women's Center as a new patient on October 7, 2008 for a dropped bladder. (R. 272-76). On examination, Dr. Brotherton diagnosed Kendall with a grade II-III anterior wall prolapse and no posterior wall prolapse. (R. 273). She recommended surgical anterior repair, and that procedure was done on October 23, 2008. (R. 273, 284-87).

At follow-up appointment with Dr. Brotherton on November 10, 2008, Kendall reported that she was urinating frequently, but she wanted to return to work. (R. 271). Dr. Brotherton wrote that Kendall was released to work on restriction. *Id.* On November 20, 2008, Kendall reported that she had a painful bulge in her vagina for three days and problems passing stools. (R. 270). On November 26, 2008, Kendall reported that she was off work and staying off her feet, and the bulging was not as bad as it had been. (R. 269). On examination, Dr. Brotherton appears to have found some swelling, but no other signs that severe prolapse was returning. *Id.* She encouraged Kendall to stay off her feet as much as possible with no heavy lifting. *Id.*

On December 8, 2008, Kendall reported to Dr. Brotherton that she still felt vaginal pressure with occasional pains on the left side and into back. (R. 268). On examination, Dr. Brotherton noted that the swelling had decreased. *Id.* She said that Kendall could resume driving and that she would release her to work in two weeks. *Id.* On December 23, 2008, Kendall reported that she had not resumed work, and she was having pain in her back and lower pelvis. (R. 267). She said she had a history of degenerative disk disease. *Id.* She also said that she was no longer noticing vaginal bulge. *Id.* On examination, Dr. Brotherton diagnosed a grade I cystocele,[1] and she discussed the recurrence and possible treatment options with Kendall. *Id.* On January 6, 2009, Dr. Brotherton diagnosed a grade II or III cystocele. (R. 266). Dr. Brotherton continued Kendall on light duty and referred her to pain management.

Kendall saw Clark J. Tingleaf, M.D. on April 10, 2009 on referral from Dwight Korgan, M.D. for an evaluation of her bladder condition. (R. 202-04). On examination, Dr. Tingleaf diagnosed her with a second-degree cystocele. (R. 203). Dr. Tingleaf urged Kendall to keep a scheduled appointment with Dr. Brotherton to discuss surgical treatment options. (R. 204). He wrote her a note for work to be restricted to light duty. *Id.*

On May 20, 2009, Kendall saw Dr. Korgan for follow-up on her use of Oxycontin, and he noted that "[b]eing up and around definitely seems to bother her." (R. 311-12). Kendall reported that her pelvic pain was better and she experienced some sharp pains in the bladder, but they didn't last too long. (R. 311). She still had left upper quadrant pain. *Id.* Dr. Korgan said that Kendall's mood was better and that she seemed to be more relaxed. *Id.* On examination, there was no pain when he palpated the left upper quadrant, and the lower pelvic and extremities were

---

[1] A cystocele is a "hernial protrusion of the urinary bladder, usually through the vaginal wall." Dorland's Illustrated Medical Dictionary 471 (31st ed. 1990).

unremarkable. *Id.* She had back pain, and Dr. Korgan was not sure if that resulted from her previous surgery or from a more recent injury. (R. 311-12). He continued her for another month on a 10-pound lifting limit at work, and he recommended that she see a chiropractor. (R. 312).

Kendall saw Dr. Korgan on June 24, 2009, and she reported that another doctor had helped her scoliosis and pain. (R. 258-59). She complained of tenderness "coming around the left anterior ribs" and discomfort into her shoulders. (R. 259). She also reported trouble with her bladder coming out. *Id.* Dr. Korgan observed that Kendall was "in a pretty good mood" even though she experienced pain and had just lost her job. *Id.* Dr. Korgan encouraged Kendall to continue to see a chiropractor for her lumbosacral spine issues. (R. 258). He diagnosed the rib issue as costochondritis of the left anterior chest, and he showed Kendall stretching exercises and discussed the possibility of future injections. *Id.* He referred her to a urologist to evaluate a sling procedure for her bladder. *Id.* He discussed breast reduction surgery that he thought might help some of her issues. *Id.*

Kendall returned to Dr. Korgan for follow-up on August 24, 2009. (R. 256-57). Kendall said that her pain was unchanged as was her use of Oxycontin twice a day. (R. 257). She reported that the urologist said that he could not help her. *Id.* She complained of the sensation of something coming out of her vagina, and she limited herself to about 15 pounds because more would cause that sensation. *Id.* She also experienced pain. *Id.* She had a significant amount of anxiety, and she had stress due to family issues. She rarely took alprazolam. *Id.* On examination, Kendall had pain when Dr. Korgan examined her left lower quadrant. *Id.* He prescribed stretching exercises. (R. 256).

Kendall saw Dr. Korgan again on September 14, 2009. (R. 371-72). In addition to her previous sources of pain, Kendall reported that she had recently experienced left shoulder pain.

7

(R. 371). Dr. Korgan continued to prescribe stretching exercises and pain medication. (R. 372). He injected six sites to treat Kendall's costochondritis. *Id.* On November 13, 2009, Kendall continued to have pain and symptoms of a prolapsed bladder. (R. 373-74). Kendall reported that she was returning to school in an attempt to obtain an accounting degree. (R. 373). He encouraged Kendall to be as active as possible, but he noted that lifting caused her pain and problems with her prolapse. (R. 374). He wanted to refer her for another consultative examination depending on her insurance coverage. *Id.*

Kendall returned to Dr. Korgan on February 2, 2010, and reported increased stress due to family situations. (R. 376-77). She reported pain in her right wrist, continued abdominal pain, headaches, trouble sleeping, and left shoulder pain. *Id.* At a return visit on March 16, 2010, Kendall reported that she could sit or stand for only 20 minutes, and she often had to lie down. (R. 378-79). Her ability to walk was restricted due to pain, even with her pain medications. (R. 378). Dr. Korgan noted that he believed Kendall would have a difficult time finding a job that would allow her to move around as needed and that would not require heavy lifting. *Id.* He said that she had considered returning to school, but was unable to sit long enough for that. *Id.* He believed that she was totally disabled, and he hoped that it would be temporary. (R. 379).

Kendall saw Paul J. Gehring, M.D. with Tulsa OBGYN on March 29, 2010 for her bladder prolapse condition. (R. 362-63, 399). On examination Dr. Gehring found a second-to-third degree cystocele, a second degree rectocele,[2] and a first degree vaginal vault prolapse. (R. 399). He discussed possible surgical treatment options with Kendall. *Id.*

---

[2] A rectocele is a "hernial protrusion of part of the rectum into the vagina." Dorland's Illustrated Medical Dictionary 1632 (31st ed. 1990).

Kendall saw Dr. Korgan on May 25, 2010, and she noted that she was waiting to see Dr. Gehring regarding bladder surgery, and he encouraged her to follow-up with that. (R. 382-83). Kendall saw Dr. Korgan again on June 14, 2010, and she reported trouble with her left shoulder. (R. 385-86). She brought in an x-ray that had been taken previously, and Dr. Korgan did not see "any calcific tendinitis." (R. 385). He said that she might have a rotator cuff tear, but he could not see that on an ordinary x-ray. (R. 386). Her range of motion of the joint was limited. *Id.* Dr. Korgan said that Kendall was unable to pursue surgery with Dr. Gehring due to financial reasons. *Id.*

Also on June 14, 2010, Dr. Korgan wrote a letter "To Whom It May Concern," stating that Kendall had a prolapsed bladder, pelvic pain, tendinitis/bursitis of her left shoulder with a possible rotator cuff tear, and chronic costochondritis. (R. 268). Dr. Korgan noted her history of cervical disk disease and her lumbar disk disease treated by Dr. Detweiler. *Id.* He said that Kendall had a lifting limit of 15 pounds, but that she could not carry that much weight. *Id.* He said that his impression was that Kendall was disabled due to her lifting limit, her restricted motion of her left shoulder, the pain from her left shoulder, and her chronic pelvic pain. *Id.*

At a July 6, 2010 appointment with Dr. Korgan, Kendall complained that her bladder condition had gotten worse. (R. 387-88). Assessments included chronic shoulder girdle muscle spasm, persistent costochondritis on the left lower ribs, chronic low back pain, and pelvic pain. (R. 387). Dr. Korgan referred her to see a physician for her left shoulder issue and another physician to see if she could get breast reduction surgery. (R. 388). On August 18, 2010, Dr. Korgan discussed treatment options for her different issues, and Kendall said that the options were limited due to financial reasons. (R. 390-91). An MRI of her left shoulder showed

supraspinatus tendon tear, and Dr. Korgan said she should be okay with that if she was careful. *Id.*

Kendall saw Jeremy D. Thomas, D.O. at The Orthopaedic Center on July 13, 2010, and his impressions were cervical radiculopathy and status post fusion C5/C6 and C6/C7 with continued neurologic symptoms. (R. 394-95). Dr. Wonhong D. Min, M.D. saw Kendall on July 21, 2010, and his impression was neck and low back pain, with some radicular symptoms. (R. 396-98). He suspected that Kendall had a left rotator cuff tear. (R. 398). Dr. Min saw Kendall again on August 12, 2010, after imaging studies had been completed. (R. 400-01). The MRI of her neck showed "severe spondylosis" and degenerative changes at the level above her previous fusion. (R. 400). The MRI of the lower back showed mild degeneration, with no severe problems or disk herniation. *Id.* MRI of the left shoulder showed supraspinatus tendon tear. *Id.* He recommended that Kendall see a shoulder specialist for evaluation, and he recommended injections for her neck to see if she received relief before considering surgery. (R. 400-01). Jean Bernard, M.D. saw Kendall on August 30, 2010 and performed an injection for her neck. (R. 402-03).

Kendall was seen for a physical consultative examination on July 18, 2009, by agency consultant Patrice Wagner, D.O. (R. 219-25). Kendall's chief complaint was chronic pain in her back and legs. (R. 219). She said she had pain with standing for long periods of time, pulling, pushing, and lifting. *Id.* She also reported that her legs went numb with activity or if she was lying down for long periods. *Id.* On examination, Kendall had full range of motion of her spine, but had pain on testing of her neck and spine. (R. 220). Her spine was tender to palpation. *Id.* Straight leg raising was negative, toe and heel walking was normal, and Kendall's gait was stable at an appropriate speed without use of assistive devices. *Id.* Dr. Wagner's assessments were

asthma, degenerative joint disease of the cervical and lumbar spine and status post fusion C5/C7, osteoarthritis, scoliosis that Dr. Wagner did not see on her examination, prolapsed bladder, irritable bowel syndrome, and depression. *Id.* On the accompanying backsheet, Dr. Wagner noted pain in range of motion testing of Kendall's cervical and lumbar spine, along with tenderness along the left side of her spine. (R. 224). All other results were within normal limits. (R. 221-25).

Luther Woodcock, M.D., an agency non-examining consultant, completed a Physical Residual Functional Capacity Assessment on July 21, 2009. (R. 226-33). Dr. Woodcock determined that Kendall had the exertional capacity to perform medium work. (R. 227). For narrative explanation, Dr. Woodcock briefly summarized Dr. Wagner's consultative examination report. *Id.* He also noted Kendall's prolapsed bladder, but also noted an April 10, 2009 examination showing that her bladder was normal to palpation, with no tenderness. *Id.* Dr. Woodcock found no other limitations. (R. 228-33).

Non-examining agency consultant Burnard Pearce, Ph.D., completed a Psychiatric Review Technique form on July 21, 2009. (R. 235-48). Dr. Pearce checked boxes indicating that Kendall's impairment was nonsevere. (R. 235). For the "Paragraph B Criteria,"[3] Dr. Pearce found that there were no restrictions of activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no

---

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of ADLs, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

episodes of decompensation. (R. 245). In the "Consultant's Notes" portion of the form, Dr. Pearce stated that Kendall made no allegations of mental health problems, had no history of mental health treatment, and was not receiving medications for mental health issues. (R. 247). Dr. Pearce stated that Kendall had been depressed at the physical consultative examination with Dr. Wagner. *Id.* He referred to an April 10, 2009 treatment note with Dr. Tingleaf that showed no depression. *Id.* He also reviewed Kendall's activities of daily living. *Id.*

## Procedural History

Kendall filed an application on June 12, 2009, for Title II disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 140-41). Kendall alleged onset of disability as May 29, 2009. (R. 140). The application was denied initially and on reconsideration. (R. 78-82, 85-87). A hearing before ALJ Deborah L. Rose was held on June 21, 2010 in Tulsa, Oklahoma. (R. 42-75). By decision dated November 24, 2010, the ALJ found that Kendall was not disabled. (R. 10-21). On April 27, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents a final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"  *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

### Decision of the Administrative Law Judge

The ALJ found that Kendall's date last insured was December 31, 2010. (R. 10, 12). At Step One, the ALJ found that Kendall had not engaged in substantial gainful activity since her alleged onset date of May 29, 2009. *Id.* At Step Two, the ALJ found that Kendall had severe impairments of degenerative disk disease of the cervical and lumbar spine, status post cervical spine fusion, left shoulder tendinitis, prolapsed bladder, and left rib costochondritis. *Id.* The ALJ found that Kendall had a medically determinable mental impairment of depression, but it was nonsevere. *Id.* At Step Three, the ALJ found that Kendall's impairments did not meet any Listing. (R. 14).

The ALJ determined that Kendall had the RFC to perform a limited range of light work, "except that she is unable to operate left upper extremity hand controls, and reach overhead with the left upper extremity - the left upper extremity is [Kendall's] non-dominant extremity. The claimant is only occasionally able to climb, balance, stoop, kneel, crouch, and crawl." *Id.* At Step Four, the ALJ found that Kendall could perform her past relevant work as a production line worker and waitress. (R. 20). Thus, the ALJ found that Kendall was not disabled from May 29, 2009 through the date of the decision. (R. 21).

### Review

Kendall argues that the ALJ's decision should be reversed due to failure to properly evaluate the opinion evidence, failure to complete an adequate analysis at Step Three and at Step Four, and failure to properly assess Kendall's credibility. Because, in light of evidence submitted after the ALJ made her decision, the decision's reasons for giving little weight to the opinion evidence of Dr. Korgan are no longer supported by substantial evidence, and this case must be reversed. Because reversal is required on this issue, the other points Kendall makes on appeal

are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight she assigns to a treating physician opinion, and if she rejects the opinion completely, then she must give specific legitimate reasons for that rejection. *Id.*

Here, the ALJ did not have the benefit of a number of the most relevant records in this case, which were submitted by Kendall's counsel after the ALJ's decision but before the Appeals Council denied review. (R. 369-449). These records include office visits of Kendall with Dr. Korgan on September 14, 2009, November 13, 2009, February 2, 2010, March 16, 2010, May 25, 2010, June 14, 2010, July 6, 2010, and August 18, 2010. (R. 371-74, 376-79, 382-83, 385-88, 390-91). The records of the multiple office visits with and imaging tests done by the physicians at The Orthopaedic Center are also part of the newly-submitted evidence. (R. 408-19). This Court includes the new evidence in its consideration of whether substantial evidence supports the ALJ's decision. "[W]e must consider the entire record, including [the newly submitted] treatment records, in conducting our review for substantial evidence on the issues presented." *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006).

In the context of the newly-submitted evidence, the ALJ's reasons for giving "little weight" to the opinion evidence of Dr. Korgan, as stated in his letter dated June 14, 2010, are no longer supported by substantial evidence. (R. 19). The ALJ's first reason for discounting Dr. Korgan's opinion was that there were only records of two treating office visits. *Id.* The newly-submitted evidence makes clear that Kendall saw Dr. Korgan on a regular basis throughout 2009 and 2010, through the relevant time period that ended when the ALJ entered her decision on November 24, 2010. Therefore, the ALJ's first rationale for discounting Dr. Korgan's opinion is not supported by substantial evidence. Her second reason was that there had been no MRI to establish that Kendall had a rotator cuff tear. *Id.* The newly-submitted evidence includes an imaging study completed in August 2010, again within the relevant period, that established that her left shoulder injury was a supraspinatus tendon tear. (R. 390-91, 400-01). This evidence would directly obviates the ALJ's second stated reason for discounting the opinion evidence.

The ALJ's third reason for discounting Dr. Korgan's opinion was that Dr. Korgan's findings did not support a 15-pound lifting restriction.[5] (R. 19). This reason is also undermined by the newly-submitted evidence, including the imaging studies, that was not available to the ALJ, but that relates to the relevant time period. The new evidence certainly includes medical findings that an adjudicator could determine support a 15-pound lifting restriction, and therefore this Court cannot determine that there is substantial evidence for the ALJ's reasoning to the

---

[5] The ALJ found it significant that Dr. Korgan "showed [Kendall] how to do some stretching exercises particularly pushups in a corner." (R. 19, 256). The ALJ characterized this as "strenuous exercise in the form of pushups to treat" Kendall's shoulder condition. *Id.* The undersigned finds that this characterization is inaccurate, because it is evident that the physician was suggesting a stretching exercise "in a corner" rather than weight-bearing pushups on the floor. *See, e.g.,* MedlinePlus [Internet]. Bethesda MD: National Library of Medicine (US); Accessed September 19, 2012.
http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000357.htm

contrary.  The ALJ's last reason was that Dr. Korgan stated in his letter that he was not treating Kendall's spine condition.  While this might be a relevant reason for reducing the amount of weight given to an opinion, it is not possible for this Court to conclude that this reason, alone, would lead to a conclusion that Dr. Korgan's opinion should be given "little weight."  *See Peeper v. Astrue*, 410 Fed. Appx. 760, (10th Cir. 2011) (unpublished) (while report, standing alone, might be sufficient to support ALJ's adverse credibility determination, court could not make this determination "without substituting [the court's] judgment for that of the ALJ").  A remand is therefore required to allow the ALJ to consider what weight to give Dr. Korgan's opinion evidence, given all of the records now contained in the administrative file.

Because this case must be reversed to allow the ALJ to consider Dr. Korgan's letter in the context of the newly-submitted evidence, the undersigned does not address the remaining contentions of Kendall.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Kendall.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 28th day of September 2012.

_/s/ Paul J. Cleary_
Paul J. Cleary
United States Magistrate Judge